**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE RIVERKEEPER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SPRINGFIELD,<br><br>Defendant. | No. 3:26-cv-00284<br><br>Hon. Eli Richardson, Judge<br>Hon. Barbara D. Holmes, Magistrate Judge |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

This Court has recently dismissed Clean Water Act ("CWA") citizen suit complaints filed by Plaintiff Tennessee Riverkeeper, Inc. ("Plaintiff" or "Riverkeeper") for failure to meet basic pleading standards. Its Amended Complaint in this case fairs no better.

Additionally, Plaintiff's Amended Complaint violates numerous constitutional provisions. Congress's enactment of 33 U.S.C. § 1365, which is the statute under which Plaintiff pursues this case, upsets the balance struck by the U.S. Constitution's Framers. In 1787, they vested the executive power in a President and established Executive Branch unity by giving the President the power to appoint, oversee, and remove subordinates. The Framers feared that a plural executive would lead to second-guessing of the President's decisions. Although the Framers chose this arrangement, Congress in 1972 shattered Executive Branch unity with CWA citizen suits, which allow additional actors to exercise executive power. And that is what happened here: despite being notified of the alleged violations in November 2025, the President's subordinates did not bring an enforcement action. That should have been the end of the story. But because Congress undermined the President's prerogatives, Plaintiff—who thinks it knows better than the President, Department

of Justice ("DOJ"), and U.S. Environmental Protection Agency ("EPA")—was allowed to bring the very claims the Executive declined to pursue. This is not an isolated incident for Plaintiff, as this is the thirty-first CWA citizen suit it has filed since 2010, second-guessing the Government.

But Congress's allowance of private plaintiffs to vitiate the President's enforcement decisions is not the worst aspect of citizen suits. By allowing private individuals who are not part of the federal government to exercise executive power, such suits also threaten the liberty and accountability our Framers sought to ensure. The vesting of all executive power in an accountable government official was just as much a part of Article II's design as the vesting of that power in one individual. Under this structure, private, unaccountable plaintiffs may not seek public remedies, which is exactly what Plaintiff attempts here by suing for civil penalties payable to the U.S. Treasury to the tune of approximately $75,000 per day, per violation.

Because Plaintiff wields executive power, this triggers the private nondelegation doctrine, which prevents private individuals from wielding government power and limits their role to giving advice, assistance, and recommendations to an agency with authority and surveillance over them. Plaintiff cannot meet this test, and its citizen suit violates this doctrine. And because Congress has allowed Plaintiff to wield executive power to bring a lawsuit that the Executive declined to pursue, Congress has interfered with the President's ability to employ prosecutorial discretion and thereby violated the Executive Vesting and Take Care Clauses. Finally, because Plaintiff exercises significant governmental authority on a continuing basis, this lawsuit violates the Appointments Clause. For all of these reasons, the Court should dismiss the Amended Complaint.

## STATEMENT OF FACTS & PROCEDURAL HISTORY

The City of Springfield ("Springfield" or "Defendant") owns and operates a sewage treatment plant, for which it obtained National Pollutant Discharge Elimination System Permit No.

TN0024961 (the "NPDES Permit"), which allows it to discharge treated wastewater to Sulphur Fork Creek and the confluence of Carr Creek and Sulphur Fork Creek, "subject to stated discharge limitations and monitoring requirements." *See* Amended Complaint (ECF Doc. 24) ("AC") ¶¶ 15, 22. Sulphur Fork Creek is a tributary of Red River, which is a tributary of Cumberland River. ECF Doc. 24-3 at ECF p. 3. On November 10, 2025, Plaintiff sent a Notice of Intent to Sue Letter to Springfield and the EPA Administrator, threatening to sue and alleging Springfield was violating the CWA by violating its NPDES Permit. *See* ECF Doc. 24-3; AC ¶ 6.

Plaintiff alleges that some of its members "have recreated in, on or near, or otherwise used and enjoyed, or attempted to use and enjoy, the Sulphur Fork Creek, Red River and Cumberland River in the past, and they intend to do so in the future." AC ¶ 11. The members allegedly "recreate less on the Cumberland River and its tributaries, including Sulphur Fork Creek and Red River because of" Springfield's alleged discharges. *Id.* ¶ 12. A member of Plaintiff, Petrus Snijders, declares that he has a guide service, where he takes his clients "on the Harpeth River, Buffalo River, Caney Fork, Percy Priest, Old Hickory Lake, [and] the Cumberland River," but not on Sulphur Fork Creek, Carr Creek, or Red River. *See* ECF Doc. 24-4 ¶ 5. He allegedly "sometimes fish[es] in the Red River and Sul[ph]ur Fork Creek" and "plan[s] to fish a tournament at Sulphur Fork Creek in September, 2026." *Id.* ¶ 6.

EPA did not initiate a lawsuit against Springfield prior to March 10, 2026. *See* AC ¶ 7. On that date, Plaintiff filed its four-count CWA Complaint under 33 U.S.C. § 1365(a), and on July 6, 2026, Plaintiff filed its Amended Complaint. It alleges Springfield violated its NPDES Permit by (1) failing to avoid overflows listed in Complaint Appendix A, *id.* ¶¶ 27–32; (2) releasing pollutants due to improper operation/maintenance, *id.* ¶¶ 33–44; (3) failing to properly report noncompliance, *id.* ¶¶ 45–57; and (4) failing to avoid overflows listed in Complaint Appendix B.

*Id.* ¶¶ 58–64. Plaintiff prays for declaratory and injunctive relief, "requests and petitions this Court to assess a $74,958.04 civil penalty . . . against Defendant Springfield for each violation and each day of continuing violation," and seeks "an award of litigation costs, including reasonable attorney's fees and expert fees." *See* AC Prayer for Relief.

## LEGAL STANDARDS

A Rule 12(b)(1) motion to dismiss for lack of Article III standing should be granted when the plaintiff fails to plausibly allege "it has suffered an 'injury in fact'" that "is fairly traceable to the challenged action of the defendant," and "it is likely . . . that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "An injury in fact must be 'concrete,' meaning that it must be real and not abstract. The injury also must be particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citations omitted). "Moreover, the injury must be actual or imminent, not speculative . . . . And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citations omitted). A Rule 12(b)(6) motion to dismiss should be granted where the complaint lacks "factual allegation[s] sufficient to plausibly suggest" a claim's elements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–83 (2009).

## THE AMENDED COMPLAINT SHOULD BE DISMISSED SINCE PLAINTIFF DOES NOT PLAUSIBLY ALLEGE A CONTINUOUS OR INTERMITTENT VIOLATION

The CWA's citizen-suit provision does not authorize suits for wholly past violations; "citizen plaintiffs [must] allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987) (holding "alleged to be in violation" in the CWA excludes "wholly past" violations of the CWA); *Tenn. Riverkeeper, Inc. v.*

*Afrakhteh*, No. 3:23-cv-749, 2024 WL 2947255, at *1 (M.D. Tenn. Jun. 11, 2024) (Trauger, J.) ("After all, a wholly past violator is not alleged to *be* in violation of the Act, only to *have been*."). It is not enough to recite that violations are "continuing," "ongoing," or "likely to recur." *Tenn. Riverkeeper v. Waste Connections of Tenn., Inc.,* 769 F. Supp. 3d 784, 792-793 (M.D. Tenn. 2025) (Trauger, J.) (finding Riverkeeper's allegations that "the violations complained or have not ceased, and are ongoing…or are likely to recur" insufficient to establish standing or subject matter jurisdiction). Rather, the allegation must be grounded in facts constituting a current or recurring violation. *Id.* Because the Amended Complaint falls short, it should be dismissed either for lack of standing under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6): "'Citizens who bring CWA citizen suits only for past violations lack standing.'" *Tenn. Riverkeeper v. Waste Connections of Tenn., Inc.*, 769 F. Supp. 3d 784, 790–91 (M.D. Tenn. 2025) (quoting *Ward v. Stucke*, No. 3:18-cv-263, 2021 WL 4033166, at *5 (S.D. Ohio Sep. 3, 2021)).[1]

Riverkeeper's Amended Complaint fails, again, to sufficiently allege ongoing violations. The alleged events in Appendices A/B remain historical. Appendix A lists overflows dating from 2021 – April 3, 2025, and Appendix B lists alleged "releases" dating from 2021 – April 6, 2025. While the Amended Complaint adds two post-suit events, a March 23, 2026 "sanitary sewer overflow" (¶ 29) and a March 18, 2026 "release" (¶ 43), these isolated incidents are discrete, one-time events that do not establish a pattern of ongoing or intermittent violations likely to continue. The Amended Complaint's addition of a single overflow and single reported release, both of which occurred several months before it was filed, do not demonstrate that a violation was occurring at the time the Amended Complaint was filed or that violations are reasonably likely to recur.

[1] *Ward* cited *Ailor v. City of Maynardville*, 368 F.3d 587, 596–97 (6th Cir. 2004). *Ward* was affirmed in *Ward v. Stucke*, No. 21-3911, 2022 WL 1467652 (6th Cir. May 10, 2022).

Instead of pleading such facts, Riverkeeper relies on the exact same conclusory allegations this Court has rejected; alleging "[s]ince Riverkeeper gave notice, the violations complained of have not ceased and are ongoing," and later repeats that the violations "are continuing and ongoing, or are likely to recur." ECF Doc. 24, ¶¶ 7, 26. But the Amended Complaint does not allege what violations continued after notice, when/where they occurred, how they reached jurisdictional waters, or what facts show a reasonable likelihood of recurrence as of March 2026.

| ECF Doc. 24, Amended Complaint | Allegations held to be conclusory in *Tenn. Riverkeeper v. Waste Connections* |
|---|---|
| ¶ 7. Since Riverkeeper gave notice, the violations complained of have not ceased and are ongoing. | "Since Riverkeeper gave notice, *the violations complained of have not ceased, and are ongoing*." 769 F. Supp. 3d at 793 |
| ¶ 26. The violations set forth herein and in the November Notice are continuing and ongoing, or are likely to recur, as of the date of this Complaint. | "The violations set forth in the paragraphs above and in the March notice *are continuing and ongoing, or are likely to recur,* as of the date this Complaint is being filed." *Id.* |

The only additional allegation is in Amended Complaint paragraph 29: "The violations set out in this Count are continuing and ongoing and there is a reasonable likelihood that Defendant will continue these or similar violations in the future." AC ¶ 29 (repeated verbatim in ¶¶ 43, 55, and 62). Again, there is no factual basis for these conclusory allegations. "[T]here are no non-conclusory averments, and no facts alleged, that support the plaintiff's contention that violations of the CWA . . . are ongoing." *Tenn. Riverkeeper v. Waste Connections*, 769 F. Supp. 3d at 793.

Because Riverkeeper has not alleged facts showing that Springfield was currently "in violation" when the Amended Complaint was filed and has not plausibly alleged ongoing or future violations likely to recur, the Court lacks citizen-suit jurisdiction over the CWA claims. The claims should be dismissed for lack of standing under Rule 12(b)(1). Alternatively, because the Amended Complaint pleads only conclusory assertions of ongoing violations and no supporting facts, dismissal is warranted under Rule 12(b)(6). *See Hikma Pharm. USA Inc. v. Amarin Pharma, Inc.*,

146 S. Ct. 1391, 1396 (2026) (unanimous Supreme Court decision reiterating that federal pleading standards require factual allegations plausibly supporting each element of a claim).

**THE AMENDED COMPLAINT SHOULD BE DISMISSED SINCE PLAINTIFF HAS NOT ADEQUATELY PLEAD ARTICLE III STANDING'S INJURY-IN-FACT PRONG**

Riverkeeper, as an association, must show that at least one of its members has standing to sue in his own right, that the interests at stake are germane to its purpose, and that neither the claims asserted nor relief requested requires the participation of individual members. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The first requirement incorporates the familiar Article III elements: a causal connection between a particularized injury that is actual or imminent and a likelihood that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Riverkeeper relies on the declaration of Petrus "Rus" Snijders, but that declaration does not establish standing for the claims asserted. Snijders states that he "sometimes" fishes in the Red River and Sulphur Fork Creek and plans to fish a tournament at Sulphur Fork Creek in September 2026. ECF Doc. 24-4 ¶ 6. He also states that he is *concerned* about pollution, *does not want to* swim in polluted water, cares about aquatic wildlife, and would *enjoy activities more* if "the sewage pollution from Springfield STP was stopped and removed." *Id.* ¶¶ 7–9. Those allegations are too generalized and conclusory to establish injury in fact.

To establish standing, "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Lujan*, 504 U.S. at 565–66. The declaration does not allege that Snijders has used, avoided, or curtailed use of any specific location affected by any alleged discharge from the City. It does not identify where he fishes in relation to the City's outfall, the alleged manhole overflows, or the alleged "release" locations. It does not allege that he saw or smelled sewage, observed degraded water quality, avoided a planned trip, canceled a guided outing, lost customers, suffered economic harm, or

changed his conduct because of any specific discharge alleged in the Amended Complaint. A generalized concern about pollution in broad waterbodies is not the same as a concrete and particularized injury traceable to the City's alleged conduct. *Kopacz v. Hopkinsville Surface & Storm Water Util.*, 714 F. Supp. 2d 682, 690 (W.D. Ky. 2010). Indeed, Snijders alleges no changes in his use of the river whatsoever due to the alleged violations. *Cf. Copas v. Lee*, 396 F. Supp. 3d 777, 792 (M.D. Tenn. 2019) (Trauger, J.) (holding that plaintiff could not establish standing "[a]bsent a present or future change in conduct"). Because it has not adequately alleged that any identified member has Article III standing to sue in his own right, Riverkeeper has not established associational standing. The Amended Complaint should be dismissed under Rule 12(b)(1).

## 33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS

### I. Plaintiff Is Exercising the Executive Power

Through § 1365, Congress has unconstitutionally vested executive power in private citizens by allowing them to seek civil penalties payable to the U.S. Treasury for alleged violations of the statute. The Framers vested "the 'executive Power'—all of it—. . . 'in a President,'" and the pursuit of "daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 219 (2020) (citation omitted); *see also Trump v. Slaughter*, 609 U.S. ---, 2026 WL 1855612, at *17 & n.4 (June 29, 2026); *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring). Because Plaintiff seeks civil penalties payable to the U.S. Treasury of almost $75,000 per day, per violation, it exercises executive power. *See* AC Prayer for Relief ¶ (c); *see also* Baron de Montesquieu, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6, p. 157 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ("the executive power" includes the power by which the magistrate "punishes"); John

Locke, *Second Treatise on Government* §§ 7, 13, pp. 9, 12 (East India Publishing Co. ed. 2023) (1689) ("the executive power" includes the "right to punish the transgressors").[2]

Further, Plaintiff exercises executive power by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976); *see also Slaughter*, 2026 WL 1855612, at *17 ("[T]he 'discretionary power to seek judicial relief' lies at the very core of executive authority." (quoting *id.* at 138)). There is a "longstanding distinction between injured parties seeking reparation for private harms and suits by sovereigns that 'seek to redress a wrong to the public as a whole, not just a wrong to the individual.'" *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1313 (M.D. Fla. 2024) (quoting *Trump v. United States*, 603 U.S. 593, 614 (2024)). This distinction is rooted in "the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs,'" *Huntington v. Attrill*, 146 U.S. 657, 668–69 (1892) (quoting 3 William Blackstone, *Commentaries on the Laws of England* *2), and "[r]ights were typically divided into private rights and public rights." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 548 (2020) (Thomas, J., concurring).

"'[P]ublic rights'" are those "that involve duties owed 'to the whole community, considered as a community, in its social aggregate capacity.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (quoting 4 Blackstone, Commentaries *5); *see also Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune v. Wofsy*, 838 F.3d 992, 1001 (9th Cir. 2016) (citation omitted). Public rights "include interests generally shared, such as . . . general

[2] Because *Seila Law* already settled this issue, based on this precedent alone, this Court can hold that Plaintiff's pursuit of civil penalties is an exercise of the executive power. Besides the argument from precedent, this Court can conduct an originalist analysis. *See United States v. Rahimi*, 602 U.S. 680, 708–10 (2024) (Gorsuch, J., concurring); *id.* at 715, 722 n.3, 723 (Kavanaugh, J., concurring); *id.* at 737–39 (Barrett, J., concurring). Such an analysis of "the executive power" would point to the same conclusion. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring).

compliance with regulatory law." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004) (footnote and citation omitted). A public wrong could be pursued only "at the suit of the king" for public remedies such as "fine and imprisonment." 4 Blackstone, *supra*, at *6. In contrast, private rights are those "'belonging to individuals, considered as individuals,'" *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (quoting 3 Blackstone, *supra*, at *2); *see also Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune*, 838 F.3d at 1001 (citation omitted). Such rights an individual can redress only by pursuing private remedies, which would "either restor[e] to him his right, if possible" (*i.e.*, have taken property returned), "or by giving him an equivalent" of "private compensation" through "civil satisfaction in damages." 4 Blackstone, *supra*, at *6–7; *see* Locke, *supra*, § 10, p. 10 ("a particular right to seek reparation from him that has done it").

The Sixth Circuit has confirmed that citizen suit plaintiffs sue to vindicate public rights because they "seek relief not on their own behalf but on behalf of society as a whole[.]" *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (citation omitted). Plaintiff is suing to redress alleged wrongs to public rights because it alleges harms to the "waters of the United States." AC ¶ 3. Indeed, it admits that the only time the CWA applies is when the "waters of the United States" are implicated. *Id.* ¶ 17. There are alleged harms to four "waters," *id.* ¶¶ 22, 30, none of which Plaintiff alleges an ownership interest in, as the only alleged "recreational, aesthetic, and environmental interests" are those the whole community shares. *Id.* ¶¶ 11–13. Thus, Plaintiff seeks to "[v]indicat[e] 'the *public* interest'" which "is the function of Congress and the Chief Executive.'" *All. for Hippocratic Med.*, 602 U.S. at 382 (citation omitted); *see* 4 Blackstone, *supra*, at *2 (The sovereign was "the person injured by every infraction of the public rights belonging to that community, and is therefore in all cases the proper prosecutor for every public offence.");

Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 789 (The Framers understood the President to be the "avenger of public wrongs."). Vindicating the public interest is not the function of private individuals, but Plaintiff attempts to do so here.

## II. Plaintiff's Exercise of Executive Power Violates the Private Nondelegation Doctrine

Congress's vesting of executive power in private plaintiffs, and Plaintiff's attempt to wield it here, run afoul of the private nondelegation doctrine. *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) ("[T]he Vesting Clauses . . . bar unchecked reassignments of power to a non-federal entity.").[3] This doctrine is violated when a law "allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025). In contrast, laws are permissible under which "private actors" provide only "advice and assistance" to "[g]overnment agencies" and "give [them] recommendations." *Id.* at 692. A government agency must "retain[] decision-making power" so that "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Id.* at 692, 695 (citation omitted). Further, private actors must "'function[] subordinately to' the agency" and be "subject to [the agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). Section 1365 violates this doctrine by allowing citizen plaintiffs to govern.

Section 1365 lets citizen plaintiffs govern by allowing them to exercise executive power. *See supra* pp. 8-11. Here, Plaintiff exercised that power by filing its Complaint and Amended Complaint without the Government's "say-so." *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). This violates the private nondelegation doctrine, as Plaintiff did not advise the Government that it should file these complaints. Plaintiff did not give the Government assistance

---

[3] *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("There is not even a fig leaf of constitutional justification" for allowing "private entities" to exercise "'executive Power,'" as "it raises '[d]ifficult and fundamental questions' about 'the delegation of Executive power' when Congress authorizes citizen suits." (alteration in original) (citation omitted)); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022).

filing these complaints. And it did not recommend that the Government file these complaints. *Id.* at 692. Instead, Plaintiff governed by making these filings without the Government's "say-so." *Id.* at 695. Thus, one cannot say the Government "alone has decision-making authority." *Id.* at 693.

Further, Plaintiff does not "'function[] subordinately to' [any] agency" because it is not "subject to [any agency's] 'authority and surveillance.'" *Id.* at 692. To determine what authority EPA/DOJ have over Plaintiff, the proper place to look is the statute, as an "agency 'literally has no power to act unless and until authorized by statute.'" *FCC v. AT&T, Inc.*, 146 S. Ct. 1418, 1428 (2026) (citation omitted) (cleaned up). The CWA gives EPA/DOJ essentially no authority over Plaintiff. The only post-suit rights any officials have is that "the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator," and, if the private plaintiff wants to settle with the defendant, the Attorney General and Administrator are entitled to only a 45-day review period. 33 U.S.C. § 1365(c)(3). They lack final decision-making authority over the proposed consent judgment. This scheme inverts the way the public and private entities are supposed to interact. To survive private nondelegation doctrine scrutiny, "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). If the private plaintiff wants to settle, however, the Government makes recommendations and the private plaintiff retains the say-so.

Although the Administrator "may intervene as a matter of right," 33 U.S.C. § 1365(c)(2), this limited intervention right does not expressly give EPA/DOJ the ability to dismiss a citizen suit over a private plaintiff's objection. It can be contrasted with the right Congress gave in the False Claims Act ("FCA") *qui tam* statute, another law that allows private plaintiffs (known as relators) to exercise executive power. 31 U.S.C. § 3730(b)(2), (c)(2)(A), (c)(3). That statute expressly gives

the Government the ability to intervene and dismiss a *qui tam* action at any time over the relator's objection.[4] *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).[5]

The CWA's "diligent prosecution bar" does not remedy the statute's constitutional defects. That bar prevents a citizen plaintiff from suing "if the Administrator or State has commenced and is diligently prosecuting a" CWA action. 33 U.S.C. § 1365(b)(1)(B). But critically, the EPA Administrator has only "sixty days" to exercise this authority "after the plaintiff has given [the Administrator] notice." *Id.* § 1365(b)(1)(A). If the Government does not sue within sixty days (as happened here), then the citizen plaintiff may file its complaint without the Government's say-so.

Even opinions holding there was no private nondelegation doctrine violation serve to underscore how far citizen suits are from satisfying this doctrine. The *Consumers' Research* Court upheld a delegation from the Federal Communications Commission ("FCC") to the private Universal Service Administrative Company, which served as Administrator for the Universal Service Fund. Whereas "the Administrator is broadly subordinate to the" FCC because the "FCC

[4] In this way, the constitutionality of § 1365 is even more suspect than the FCA *qui tam* statute. *Polansky*, 599 U.S. at 442 (Kavanaugh, J., joined by Barrett, J., concurring) (stating "'[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'" (citation omitted)); *id.* at 449 (Thomas, J., dissenting) (same).

[5] Although § 1365(c)(2) does not expressly allow EPA/DOJ to dismiss a citizen suit over a private plaintiff's objections, one could argue that the President's inherent authority to remove those exercising executive power gives him the ability to dismiss citizen suits. *See generally Slaughter*, 2026 WL 1855612. If this is correct, and assuming, *arguendo*, that this gives the Executive Branch "authority and surveillance" over citizen plaintiffs such that they are "subordinate," this does not cure the private nondelegation violation for two reasons. First, subordination is necessary, not sufficient. An agency needs to have authority, *and* it needs to exercise that authority such that nothing the citizen plaintiffs do has any "legal (or, indeed, practical) effect [until] the [agency] decides they should." *Consumers' Rsch.*, 606 U.S. at 694. Second, an ability to intervene and dismiss essentially amounts to some back-end review, which would be "too little too late." *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1326 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025) (preliminarily enjoining Financial Industry Regulatory Authority ("FINRA") from expelling a member prior to review by the Securities and Exchange Commission ("SEC") because "SEC review can come only after, not before, the expulsion [from FINRA] takes effect").

appoints the Administrator's Board of Directors and approves its budget," here, Plaintiff self-appoints and approves its own case budget. *Consumers' Rsch.*, 606 U.S. at 692-93 (citation omitted). Further, the "Administrator makes the initial projections" and "estimates the programs' cost," which the FCC reviews "and either revises or approves." *Id.* at 693-94. Thus, the FCC was the entity making the final decision. In contrast, citizen plaintiffs do not recommend how CWA suits should proceed and instead litigate cases independent of EPA's surveillance. "In every way that matters to the constitutional inquiry, [Plaintiff], not the [EPA], is in control." *Id.* at 695.

And although the Sixth Circuit rejected a facial challenge to the Horseracing Integrity and Safety Act ("HISA"), it did so because HISA gives the Federal Trade Commission ("FTC") "'pervasive' oversight and control of the [Horseracing Integrity and Safety] Authority's enforcement activities[.]" *Oklahoma*, 163 F.4th at 312. For example, whenever the Authority proposes a sanction, an "aggrieved entity may obtain review from an Administrative Law Judge," and "[a]fter that, the FTC has full authority to review . . . [and] reverse any sanction by the Authority." *Id.* at 311 (citations omitted). Further, the "Authority's adjudication decisions do not become final until the FTC has the opportunity to review them," and if "the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction." *Id.* (citations omitted). Also, HISA empowers the FTC to promulgate "rules constraining the Authority's investigations and increasing the procedural rights" and "to determine *who* the Authority investigates." *Id.* at 312. Indeed, at the time *Oklahoma* was decided, there was a proposed "rule that would require the FTC's approval before the Authority may issue a subpoena or bring a civil enforcement action." *Id.* (citation omitted). There is nothing remotely similar here.

Enforcing the private nondelegation doctrine to grant this motion also would further the rationale behind vesting the executive power in the sovereign alone. The Framers took the "sword

out of private hands and turn[ed] it over to an organized government, acting on behalf of all the people." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282–83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari); *see also* 4 Blackstone, *supra*, at *7–8 ("In a state of society this right is transferred from individuals to the sovereign power."); Locke, *supra*, §§ 88–89, pp. 55–56 ("every man who has entered into civil society . . . has thereby quitted his power to punish offences" and has "quit . . . his executive power"). This was done to prevent self-interested, private individuals from using "the power of human punishment" for their own ends. 4 Blackstone, *supra*, at *7–8; *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (delegation to "private persons" was unconstitutional because they were not "disinterested"); Locke, *supra*, § 90, p. 56. But with § 1365, Congress undid the Framers' design and returned the sword to private individuals.

Further, this diffusion of executive power, and vesting of it in citizen plaintiffs who are not accountable to the President, impairs the liberty and accountability the separation of powers was meant to secure. *Oklahoma*, 163 F.4th at 305 ("Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn."); *see also Ass'n of Am. R.R.s*, 575 U.S. at 57 (Alito, J., concurring); *Black*, 53 F.4th at 880; Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339, 391 (1990). Plaintiff does not merely give advice, assistance, and recommendations to EPA, it does not function subordinately to EPA, and it is not subject to EPA's authority and surveillance such that EPA retains decision-making power. *Consumers' Rsch.*, 606 U.S. at 692; *see also Alpine*, 121 F.4th at 1325; *Black*, 53 F.4th at 889–90. For these reasons,[6] and because

[6] Congress exacerbated the private delegation violation because § 1365 "also forecloses certain indirect methods of Presidential control" by allowing Plaintiff "receipt of funds outside the appropriations process." *Seila Law*, 591 U.S. at 225–26. "The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies." *Id.* at 226 (citations omitted). Although "Presidents frequently use these budgetary tools

"'quintessentially executive' power may not be cleaved off from the Executive Branch," *Slaughter*, 2026 WL 1855612, at *17, the citizen suit provision and Plaintiff's lawsuit violate the private nondelegation doctrine.

## III. CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion

Congress's vesting of executive power in private plaintiffs impairs the President's ability to employ prosecutorial discretion, which is a core executive power. *United States v. Texas*, 599 U.S. 670, 684 (2023); *id.* at 689 (Gorsuch, J., concurring in judgment). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *see also United States v. Traficant*, 368 F.3d 646, 650 (6th Cir. 2004) ("'the Executive Branch [has] exclusive authority and absolute discretion to decide whether to prosecute a case'" (citation omitted)). The Framers imbedded this concept in Article II because they took to heart "Montesquieu's maxim" that "[i]f the executive and legislative powers were united, the wielder of both powers would enact tyrannical laws and execute them tyrannically." Prakash, *supra*, at 798 (footnotes omitted). With "the executive Power" separated, however, "the executive could temper the effects of tyrannical laws with mild execution." *Id.* at 781 (footnote omitted); *see also* Locke, *supra*, § 11, p. 10–11.

The power of prosecutorial discretion extends to "an agency's decision not to prosecute or enforce, whether through civil or criminal process, [and] is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). This is because "an

---

'to influence the policies of independent agencies,'" "no similar opportunity exists for the President to influence" plaintiffs' pursuit of citizen suits. *Id.* (citation omitted). For example, if EPA or DOJ exercises discretion contrary to his wishes, the President can limit their funding through a budget bill veto. Plaintiff, however, is immune from this pressure because it self-funds.

agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832 (citation omitted); *see also Buckley*, 424 U.S. at 139. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants . . . falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Through CWA citizen suits, however, private plaintiffs (and their attorneys) vitiate prosecutorial discretion by choosing how to prioritize and how aggressively to pursue CWA actions against defendants. Indeed, the only time citizen suit plaintiffs can sue is when, after a 60-day waiting period, the Executive Branch does not prosecute the alleged CWA violation. *See* 33 U.S.C. § 1365(b)(l)(A). To be sure, the President may head off the citizen suit by having the Administrator commence a lawsuit, *see id.* § 1365(b)(1)(B), but this impinges on the President's power of prosecutorial discretion by forcing him to do the very thing he does not want done. *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting).

*Trump v. United States* confirms that Congress may not second-guess the Executive Branch's enforcement decisions, as the Court reiterated that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and this authority finds its source in the Take Care Clause. 603 U.S. at 620 (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting); *see also*

*Slaughter*, 2026 WL 1855612, at *19. The CWA's citizen suit provision, however, allows Congress to avoid this prohibition by empowering private citizens to bring the very claims that the President decided to not pursue. Thus, "'by concentrating power in a unilateral actor insulated from Presidential control,'" Congress breaks the executive chain of command by allowing unaccountable private parties to bring lawsuits that the Executive Branch has chosen not to pursue. *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (citation omitted).

Moreover, by requiring this Court "to enforce" the very "effluent standard or limitation" that the President has declined to enforce, *see* 33 U.S.C. § 1365(a), Congress exacerbates the Take Care violation by "transfer[ring] from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan*, 504 U.S. at 577 (citation omitted). The Supreme Court has "always rejected" such a "vision of [its] role" that "would enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *Id.* (citations omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("But federal courts do not exercise general oversight of the Executive Branch . . . ."). It has also recognized a distinction between "a mere ministerial duty, the performance of which might be judicially enforced," and a duty that is "purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 498–99 (1866) (A ministerial duty "is one in respect to which nothing is left to discretion."). There are "general principles which forbid judicial interference with the exercise of Executive discretion," as any attempt by the Judiciary to control discretionary duties "might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* at 499. This is exactly what Congress forces the Judiciary to do through § 1365.

This subjects citizen suit defendants to a loss of "liberty as described by Locke"; liberty understood as "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another

man.'" *Ass'n of Am. R.R.s*, 575 U.S. at 75–76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J. Gough ed. 1947)); *see also Seila Law*, 591 U.S. at 223–24. Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J., concurring). But because CWA citizen suits prevent the proper operation of Article II, any private plaintiff who disagrees with EPA's decision not to sue can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gave the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President and his Executive Branch subordinates' power to decline to bring lawsuits. *Texas*, 599 U.S. at 678; *Heckler*, 470 U.S. at 831–32. Congress undermined that prerogative with CWA citizen suits.[7]

## IV. Congress Violated the Appointments Clause

By creating CWA citizen suits, Congress violated the separation of powers by allowing private citizens to exercise significant governmental authority contrary to the Appointments Clause. The Clause by default requires the President to nominate and the Senate to confirm all "Officers of the United States," while allowing an exception for "inferior Officers" whose appointment Congress has "by Law vest[ed] . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. This arrangement "prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to

[7] Defendant acknowledges that multiple district courts have rejected constitutional arguments against CWA citizen suits. *See, e.g.*, *Patterson v. Barden & Robeson Corp.*, No. 04-cv-803, 2007 WL 542016, at *8 (W.D.N.Y. Feb. 16, 2007); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555–56 (E.D.N.C. 2001); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623–26 (D. Md. 1987); *Student Pub. Interest Rsch. Grp. of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985). But none of these non-binding opinions involved a private nondelegation doctrine argument, much less Defendant's history and text-based arguments. Moreover, they lacked the benefit of the Supreme Court's recent opinions.

appoint." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991). An individual is an "officer" requiring appointment under the Appointments Clause when he (1) "'exercise[es] significant authority pursuant to the laws of the United States'"; and (2) "occup[ies] a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citations omitted).[8]

The first prong's requirements are established by the prior sections on the Executive Vesting and Take Care Clauses, and this argument need not be repeated here in full. It suffices to say that Plaintiff exercises "significant authority" by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley*, 424 U.S. at 140. Further, Plaintiff exercises "significant authority" by pursuing "daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power." *Seila Law*, 591 U.S. at 219. Courts also consider "significant authority" to exist when an actor "'exercise[s] significant discretion,'" *Lucia*, 585 U.S. at 245, 247–48 (citation omitted), which occurs here because Plaintiff "possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678 (citations omitted). These powers distinguish CWA citizen suits from *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, where the Sixth Circuit rejected an Appointments Clause challenge to the FCA's *qui tam* provision. 41 F.3d 1032, 1041 (6th Cir. 1994) ("[T]he relator is not vested with governmental power."). *Cf. Zafirov*, 751 F. Supp. 3d at 1310 (criticizing and declining to follow *Taxpayers Against Fraud*). Further, the Sixth Circuit upheld the FCA's *qui tam* provision in part because—unlike with CWA citizen suits—"the government may take complete control of the case

[8] There is debate over whether the Appointments Clause applies to individuals/entities who are not part of the government and whether challenges to non-governmental individuals/entities should be through the private nondelegation doctrine instead. Defendant makes this argument in the alternative to its private nondelegation argument, and the Court need not address the Appointments Clause argument if it dismisses on private nondelegation grounds.

if it wishes." *Taxpayers Against Fraud*, 41 F.3d at 1041. And, unlike those who are non-officers, Plaintiff does not operate in an "advisory" role and make "only non-binding recommendations." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). Thus, the first prong is met.

The second prong also is met because Plaintiff "occup[ies] a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (citation omitted). This prong "[s]tress[es] 'ideas of tenure [and] duration'" and asks whether the putative officer's statutory duties are "'occasional or temporary' rather than 'continuing and permanent.'" *Id.* (citation omitted). This inquiry "embraces the ideas of tenure, duration, emolument, and duties" as set out in the relevant statute. *Germaine*, 99 U.S. at 511. Here, this test is met because the statute identifies the office's duties, including that the citizen plaintiff must give sixty days' notice "of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]" 33 U.S.C. § 1365(b)(1)(A). The office includes the powers to "commence a civil action . . . against any person . . . alleged to be in violation" and seek "any appropriate civil penalties." *Id.* § 1365(a). Further, "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action," the citizen plaintiff "may intervene as a matter of right." *Id.* § 1365(b)(1)(B). Finally, § 1365(d) gives "any prevailing or substantially prevailing" citizen plaintiff an emolument of "costs of litigation."[9]

[9] This Court can hold that Plaintiff occupies a continuing position even if not all factors of the *Lucia* "continuing position" test are met. For example, the Supreme Court recently held that members of the Preventative Services Task Force are officers even though "[t]hey serve on a volunteer basis" and "are not paid by the Federal Government." *Braidwood*, 606 U.S. at 755.

The notion that Plaintiff "occupies a continuing position" is bolstered by the fact that, since 2010, it has filed thirty-one CWA citizen suits in the Eastern[10] and Middle[11] Districts of Tennessee and Northern District of Alabama.[12] Essentially, it "acts as a self-appointed mini-EPA." *See Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting). This continuing nature of Plaintiff's enforcement actions further distinguishes CWA citizen suits from *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Furthermore, the relator's 'position is without tenure, duration, continuing emolument, or continuous duties.'" (citation omitted)). If multiple courts have held that an individual who temporarily pursues a single case can be an officer, *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (special prosecutors appointed by district courts); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) (special counsel); *In re Sealed Case*, 829 F.2d 50, 56–57 (D.C. Cir. 1987) (independent counsel), then a litigant like Plaintiff which regularly files enforcement actions over

---

[10] *Tenn. Riverkeeper, Inc. v. City of Luttrell*, No. 3:25-cv-541; *Tenn. Riverkeeper, Inc. v. City of Maynardville*, No. 3:25-cv-208; *Tenn. Riverkeeper, Inc. v. City of Manchester*, No. 4:20-cv-34; *Tenn. Riverkeeper, Inc. v. Hamilton Cnty. Wastewater Treatment Auth.*, No. 1:18-cv-254; *Tenn. Riverkeeper, Inc. v. City of Oak Ridge*, No. 3:18-cv-374.

[11] *Tenn. Riverkeeper, Inc. v. Town of Alexandria*, No. 2:26-cv-32; *Tenn. Riverkeeper, Inc. v. City of Spring Hill*, No. 1:25-cv-74; *Tenn. Riverkeeper, Inc. v. Town of Monterey*, No. 2:25-cv-66; *Tenn. Riverkeeper, Inc. v. Town of Chapel Hill*, No. 1:24-cv-50; *Tenn. Riverkeeper, Inc. v. City of Celina*, No. 2:24-cv-79; *Tenn. Riverkeeper, Inc. v. Barnes*, No. 3:24-cv-113; *Tenn. Riverkeeper, Inc. v. Waste Connections of Tenn.*, No. 3:24-cv-883; *Tenn. Riverkeeper, Inc. v. Tweden*, No. 3:24-cv-886; *Tenn. Riverkeeper, Inc. v. Town of Kingston Springs*, No. 3:24-cv-1241; *Tenn. Riverkeeper, Inc. v. BGC Dev., LLC*, No. 3:24-cv-1461; *Tenn. Riverkeeper, Inc. v. Afrakhteh*, No. 3:23-cv-749; *Tenn. Riverkeeper, Inc. v. Ray*, No. 3:23-cv-878; *Tenn. Riverkeeper, Inc. v. City of Lebanon*, No. 3:23-cv-1369; *Tenn. Riverkeeper, Inc. v. City of Lewisburg*, No. 1:22-cv-28; *Tenn. Riverkeeper, Inc. v. City of Cookeville*, No. 2:22-cv-44; *Tenn. Riverkeeper, Inc. v. City of Sparta*, No. 2:22-cv-46; *Tenn. Riverkeeper, Inc. v. City of McEwen*, No. 3:22-cv-919; *Tenn. Riverkeeper, Inc. v. City of Lawrenceburg*, No. 1:20-cv-52; *Tenn. Riverkeeper, Inc. v. City of Clarksville*, No. 3:20-cv-68; *Tenn. Riverkeeper, Inc. v. City of Pulaski*, No. 1:18-cv-61; *Tenn. Riverkeeper, Inc. v. Ashland City*, No. 3:18-cv-233.

[12] *Tenn. Riverkeeper, Inc. v. Hensley-Graves Holdings, LLC*, No. 2:13-cv-877; *Tenn. Riverkeeper, Inc. v. Water Works & Sewer Bd. of the Town of Ardmore*, No. 2:12-cv-1633; *Tenn. Riverkeeper, Inc. v. Kennamer*, No. 2:11-cv-3506; *Tenn. Riverkeeper, Inc. v. Hope Coal Co.*, No. 2:10-cv-3515.

a sixteen-year period qualifies as an officer. Further, the office of citizen suit plaintiff is not personal to Plaintiff, which is underscored by the fact that Plaintiff is a nonprofit corporation; if it withdrew, the suit still could be prosecuted by one or more of its members. *See* AC ¶¶ 10–13. Thus, the office's "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.).

Thus, Plaintiff "occupies a continuing position" and satisfies the second step for officer status. But it has not been appointed to its office consistent with the Appointments Clause, nor does the CWA require that it be so appointed. Therefore, § 1365 violates the Appointments Clause.

## V. CWA Citizen Suits Have No Basis in History or Tradition

Besides examining Article II's clauses to determine whether Congress violated the separation of powers, the Supreme Court considers as relevant whether a statute lacks a historical precedent. According to this criterion, courts considering constitutional challenges should view Congressional enactments with skepticism when they are "an innovation with no foothold in history or tradition." *Seila Law*, 591 U.S. at 222. "'Perhaps the most telling indication of the severe constitutional problem with [a statute] is the lack of historical precedent for'" it. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (citation omitted). Citizen suits have no foothold in history or tradition because "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs . . . . The situation has changed markedly, especially over the last 50 years or so." *TransUnion*, 594 U.S. at 428 n.1. Their status as "a historical anomaly" provides additional evidence as to why there are constitutional violations. *Seila Law*, 591 U.S. at 220, 222 ("CFPB's single-Director structure" was unconstitutional because it was "almost wholly unprecedented"); *see United States v. Arthrex*, 594 U.S. 1, 21 (2021).[13]

[13] The United States agrees "citizen suits lack the historic pedigree" needed for them to be upheld. *See NAACP v. x.AI*, No. 3:26-cv-74, ECF Doc. 86 at ECF p. 28 n.5 (N.D. Miss. Jul. 7, 2026).

Far from there being a tradition of private citizens exercising executive power, there has been since the Founding a tradition of the Executive pursuing public remedies to vindicate public rights and having discretion over such suits. *See supra* pp. 8-11, 16-19. This tradition was confirmed by the Supreme Court in the nineteenth century. *Martin v. Hunter's Lessee*, 14 U.S. 304, 329–30 (1816) ("The second article declares that 'the executive power *shall be vested* in a president of the United States of America.' Could congress vest it in any other person . . . ? It is apparent that such a construction . . . would be utterly inadmissible."); *Confiscation Cases*, 74 U.S. 454, 457 (1868) (noting the "[s]ettled rule" that "civil or criminal" suits cannot proceed "for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business, in his absence, as may appertain to the duties of his office"). This understanding continued into the twentieth century, *Buckley*, 424 U.S. at 139; *Printz v. United States*, 521 U.S. 898, 922–24 (1997), and remains the law today. *All. for Hippocratic Med.*, 602 U.S. at 382; *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment).

Any contention that citizen suits pass constitutional muster because as *TransUnion* acknowledged, they have been included in federal statutes over the last fifty-five years, must be rejected. A court's "inquiry is sharpened rather than blunted by the fact that Congressional [enactments] are appearing with increasing frequency in statutes which delegate authority to" private plaintiffs to wield executive power. *INS v. Chadha*, 462 U.S. 919, 944 (1983); *see also Slaughter*, 2026 WL 1855612, at *20; *Seila Law*, 591 U.S. at 231–32.

Indeed, due to the nature of Congress's constitutional powers, it is unsurprising that it can take more than a half-century for novel Congressional enactments to be found unconstitutional. Because Congress's powers are "'at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments

which it makes on the co-ordinate departments.'" *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273–74 (1991) (citation omitted). Congress has encroached on the Executive Branch by creating CWA citizen suits, which have no "foothold in history or tradition," a consideration that points to a separation of powers violation.

## **CONCLUSION**

The Court should grant Defendant's motion because Plaintiff fails to plausibly allege a continuous or intermittent violation of the CWA and lacks Article III standing. And although the Constitution envisions checks against the excessive application of executive power, CWA citizen suits eviscerate these checks by violating numerous constitutional provisions. Any role private plaintiffs may have in the enforcement of federal environmental law is constitutionally limited to seeking private remedies for alleged private wrongs. But Congress did not structure the CWA that way. Instead, Plaintiff's citizen suit is an exercise of Article II's executive power, which Plaintiff has no right to wield. If Congress believes under-enforcement of the CWA to be a problem, "other forums remain open for examining the Executive Branch's" purported lack of diligence. *Texas*, 599 U.S. at 685. "For example, Congress possesses an array of tools to analyze and influence those policies—oversight, appropriations, the legislative process, and Senate confirmations, to name a few. And through elections, American voters can both influence Executive Branch policies and hold elected officials to account for enforcement decisions." *Id.* (citation omitted). Because CWA citizen suits violate the Constitution's Executive Vesting, Take Care, and Appointments Clauses, as well as the private nondelegation doctrine, the Court should grant the motion to dismiss.

DATED: July 20, 2026.

Respectfully submitted,

*/s/ Joshua Lee*

Sean J. Radomski,* Pa. No. 319732
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000

Joshua C. Lee (No. 30227)
William ("Bill") Penny (No. 09606)
THOMPSON BURTON PLLC

Arlington, VA 22201
(202) 888-6881
sradomski@pacificlegal.org

Damien M. Schiff,* Cal. Bar No. 235101
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111
dschiff@pacificlegal.org

*Admitted Pro Hac Vice*

1801 West End Avenue, Suite 1550
Nashville, TN 37203
Telephone: (615) 988-1628
Facsimile: (615) 807-3048
Joshua.Lee@thompsonburton.com
bpenny@thompsonburton.com

*Attorneys for Defendant City of Springfield*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2026, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which is understood to have sent notification of such filing electronically to all counsel of record.

/s/ Joshua Lee
*Attorney for Defendant*